**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| EMILY CASTILLO, on behalf of herself and all others similarly situated, | **CASE NO.:** |
| Plaintiff, | **CLASS ACTION** |
| v. | **JURY TRIAL DEMANDED** |
| UNILEVER UNITED STATES, INC., and CONOPCO, INC. d/b/a UNILEVER HOME & PERSONAL CARE USA, | |
| Defendants. | |

**CLASS ACTION COMPLAINT**

Plaintiff, Emily Castillo ("**Plaintiff**"), on behalf of herself and all others similarly situated, brings this class action against Defendants, Unilever United States, Inc. ("Unilever"), and Conopco, Inc. d/b/a Unilever Home & Personal Care USA ("Conopco") (collectively, "Unilever" or "**Defendants**"), and alleges on personal knowledge, investigation of her counsel, and on information and belief as follows:

**INTRODUCTION**

1.      This is a nationwide class action brought by Plaintiff on behalf of herself and other similarly situated consumers who purchased TRESemmé Keratin Hair Smoothing Shampoo and/or TRESemmé Keratin Smooth Color Shampoo (collectively, the "**Products**" or "**TRESemmé Products**") for personal or household use and not for resale ("**Class**" or "**Class Members**").

2.      Plaintiff purchased the Products because of Unilever's uniform false representation that the Products would smooth her hair and coat it with Keratin, a protein found naturally in hair. Undisclosed by Defendants to Plaintiff and Class Members and therefore unknown to Plaintiff and

Class Members, the Products contain an ingredient or combination of ingredients that causes significant hair loss and/or scalp irritation upon proper application. At least one ingredient in the Products, DMDM hydantoin, is a formaldehyde donor known to slowly leach formaldehyde when coming into contact with water. Formaldehyde is a well-known human carcinogen that can cause cancer and other harmful reactions when absorbed into skin. DMDM hydantoin has been used a preservative in Unilever products for more than a decade; however, the use of DMDM hydantoin as a preservative is an entirely unnecessary risk because various safer natural alternatives exist. As such, the Products are rendered dangerous and unsafe for sale as over-the-counter hair smoothing shampoo products.

3. Defendants failed to properly warn consumers of the risks and dangers attendant to the use of such a strong ingredient on their hair and scalp – even well after Defendants knew or should have known of the Products' hazards. Defendants continued to conceal the dangers of the Products by failing to appropriately and fully recall the Products, by continuing to claim the Products were safe when properly applied, and by failing to warn consumers of the dangers attendant to the Products' use.

4. Defendants' uniform acts and omissions in connection with the development, marketing, sale and delivery of the Products violate the consumer protection laws of the states of residence of Plaintiff and other members of the Class, breaches Unilever's express and implied warranties to Plaintiff and the Class, and unjust enrichment by the Defendants.

5. Unilever labeled, advertised, promoted and sold the Products targeting women who wanted smooth, shiny, manageable hair with no frizz.

6. The Products are marketed in large bold font on the Products' front labels as "Keratin Smooth":

2

 

7.　　Through its labeling and an extensive marketing campaign, including through its website and online advertisements, Unilever made a number of express warranties: that the Products contain a keratin formula intended to smooth hair, add softness and shine, and prevent frizzing and tangling[1]; and that the Products "deeply nourish," "gently cleanse," and "repair hair."[2]

8.　　However, the Products' formula contains an ingredient, or combination of

---

[1] www.TRESemmé.com/us/en/collections/keratin-smooth.html (Last Accessed October 8, 2020).
[2] www.TRESemmé.com/us/en/collections/keratin-smooth.html ("How it works")(Last Accessed October 8, 2020).

3

ingredients, that has caused Plaintiff and thousands of consumers to experience hair loss and/or scalp irritation.

9.     At least one ingredient in the Products, DMDM hydantoin, is a formaldehyde donor known to slowly leach formaldehyde when coming into contact with water. Formaldehyde is a well-known human carcinogen that can cause cancer and other harmful reactions when absorbed into skin. DMDM hydantoin has been used a preservative in Unilever products for more than a decade; however, the use of DMDM hydantoin as a preservative is an entirely unnecessary risk because various safer natural alternatives exist.

10.     DMDM hydantoin is found in the Products as stated on the Products' back labels:

- Below is the ingredient list located on the back label of the TRESemmé Keratin Smooth Color Shampoo:

INGREDIENTS: WATER (AQUA), SODIUM LAURETH SULFATE, COCAMIDOPROPYL BETAINE, SODIUM CHLORIDE, GLYCERIN, HYDROLYZED KERATIN, SCLEROCARYA BIRREA SEED OIL, ARGANIA SPINOSA KERNEL OIL, DIMETHICONOL, FRAGRANCE (PARFUM), GLYCOL DISTEARATE, CARBOMER, GUAR HYDROXYPROPYLTRIMONIUM CHLORIDE, TEA-DODECYLBENZENESULFONATE, CITRIC ACID, PPG-9, DMDM HYDANTOIN, DISODIUM EDTA, PEG-45M, SODIUM BENZOATE, ETHYLHEXYL METHOXYCINNAMATE, METHYLCHLOROISOTHIAZOLINONE, METHYLISOTHIAZOLINONE, COCAMIDE MEA, MICA (CI 77019), TITANIUM DIOXIDE (CI 77891)

- Below is the ingredient list located on the back label of the TRESemmé Keratin Hair Smoothing Shampoo:

INGREDIENTS: WATER (AQUA), SODIUM LAURETH SULFATE, COCAMIDOPROPYL BETAINE, SODIUM CHLORIDE, GLYCERIN, HYDROLYZED KERATIN, SCLEROCARYA BIRREA SEED OIL, DIMETHICONOL, FRAGRANCE (PARFUM), GLYCOL DISTEARATE, CARBOMER, GUAR HYDROXYPROPYLTRIMONIUM CHLORIDE, TEA-DODECYLBENZENESULFONATE, CITRIC ACID, PPG-9, DMDM HYDANTOIN, DISODIUM EDTA, PEG-45M, SODIUM BENZOATE, METHYLCHLOROISOTHIAZOLINONE, METHYLISOTHIAZOLINONE, COCAMIDE MEA, MICA (CI 77019), TITANIUM DIOXIDE (CI 77891)

4

11. In fact, for approximately a decade or longer, Unilever has known that DMDM hydantoin can cause or contribute to hair loss and scalp irritation when used as a preservative in hair products, including keratin products. Specifically, DMDM hydantoin, and other ingredients, were the subject of prior litigation initiated in 2012 against Unilever for hair loss and scalp irritation related to its Suave Professionals Keratin Infusion products.[3] In fact, the Suave Keratin product was recalled in 2012 following complaints that the products caused hair loss and scalp irritation, and were advertised as formaldehyde free, while containing DMDM hydantoin. The $10.2 million settlement in Unilever's Suave case was upheld by the Seventh Circuit Court of Appeals in 2016.

12. Despite having public knowledge since at least 2012 that DMDM hydantoin, as a formaldehyde donor, can cause or contribute to hair loss and scalp irritation, Unilever continued to proudly include this ingredient as a preservative in its products, and even goes so far as to represent to the public that DMDM hydantoin is safe for use in its hair care products.[4]

13. Upon information and belief, despite Unilever's current acknowledgment that it uses DMDM hydantoin as a preservative, it has recently reformulated the Products and has removed DMDM hydantoin and replaced it with several other ingredients that serve as preservatives.

14. Although Unilever has, or should have been aware, of the high potential for toxicity or allergic reaction caused by one or more of the ingredients in the TRESemmé Products, it has failed and continues to fail to warn consumers about possible reactions, including hair loss and scalp irritation.

---

[3] *Reid, et al. v. Unilever United States, Inc., et al.*, C.A.N. 1:12-cv-06058 (N.D. Ill.).
[4] https://www.unilever.com/brands/our-products-and-ingredients/your-ingredient-questions-answered/formaldehyde-donors.html (Last Accessed October 8, 2020).

15.     Nowhere on the package labeling or on Unilever's websites or other marketing materials did Unilever warn Plaintiff and members of the Class that they were at risk of significant hair loss and/or scalp irritation upon proper application of the products. Even Unilever's "Formaldehyde donors" page fails to recognize any associated risk of reaction to DMDM hydantoin. Accordingly, Unilever misled and deceived the public, and placed their customers in harm's way, all for the sake of increased profits.

16.     U.S. consumers reasonably expect that their hair care products will not cause significant hair loss and/or scalp irritation because of defective design and manufacturing or because of inadequate research of due diligence. In addition, U.S. consumers had no expectation that the Products would cause scalp irritation and cause their hair to fall out.

17.     Further, consumers reasonably expect that if Unilever, the company primarily responsible for developing, manufacturing, marketing and distributing the Products, knew that the Products would or could cause hair loss (whether by proper application or by misapplication), Unilever would make a disclosure to consumers as soon as it determined there was a widespread problem, rather than attempting to conceal the problem. By downplaying, concealing and misrepresenting the Products and the safety and risks of their use, Unilever failed in its duty to provide consumers with adequate information, and continued even knowing of the Products' dangers to create and perpetuate a false public perception that there was little or no risk of harm from the use of its Products. Moreover, Unilever's efforts to conceal and downplay the hundreds if not thousands of complaints of Class Members who have lost their hair or endured scalp irritation, as a result of using the Products as intended, comprised a pointed attack on consumers.

18.     Defendants manufacture, advertise, market, distribute and sell the TRESemmé Products throughout the United States, and in Illinois. As alleged with specificity herein, through an extensive, uniform, nationwide advertising and marketing campaign, specifically marketing

the Products as "smooth" keratin-based Shampoos.

19.     Unilever labeled, advertised, promoted and sold the Products targeting women who wanted to safely nourish, cleanse, and repair hair in order to obtain smooth, shiny, manageable hair with no frizz. Through an extensive marketing campaign and via its website and packaging, Unilever made a number of express warranties, including that the Products were formulated to safely nourish, cleanse, and repair hair in order to obtain smooth, "frizz-less" results.

20.     Unilever further represented through its website that, *inter alia*, its formaldehyde donors, including DMDM hydantoin, "are used in personal care products as safe and efficient preservatives."[5] It further represents that "Product safety is our top priority… People trust us to provide them with products that are safe for them, their families and the environment,"[6] and that its "expert scientists use state of the art methods to ensure [Unilever] use[es] ingredients at the minimum level required to be effective, without causing people to become allergic."[7]

21.     However, Unilever knew, but failed to disclose to Plaintiff and the Class the danger of hair loss and/or scalp irritation caused by one or more ingredients in the Products, including the formaldehyde donor ingredient DMDM hydantoin.

22.     Defendants failed to properly warn consumers of the risks and dangers attendant to the use of such a strong preservative and human toxicants on their hair and scalp – even well after Defendants knew or should have known of its hazards. Defendants continued to conceal the dangers of the Products by failing to recall the Products, and otherwise claim they are safe when properly applied.

---

[5] https://www.unilever.com/brands/our-products-and-ingredients/your-ingredient-questions-answered/formaldehyde-donors.html (Last Accessed October 8, 2020).
[6] https://www.unilever.com/brands/our-products-and-ingredients/Our-approach-to-the-safety-of-products-and-ingredients/ (Last Accessed October 8, 2020).
[7] https://www.unilever.com/brands/our-products-and-ingredients/ (Last Accessed October 8, 2020).

23.     As a result of Defendants' misconduct and misrepresentations, Plaintiff and putative Class Members have suffered injury in fact, including economic damages.

24.     Plaintiff brings this suit to halt the unlawful sales and marketing of the Products by Defendants and for damages she sustained as a result. Given the massive quantities of the Products sold all over the country, this class action is the proper vehicle for addressing Defendants' misconduct and for attaining needed relief for those affected.

## PARTIES

25.     Plaintiff Emily Castillo is and was at all times relevant to this matter a resident of the state of Illinois.

26.     Defendant Unilever is a subsidiary of the dual-listed company consisting of Unilever N.V. in Rotterdam, Netherlands and Unilever PLC in London, United Kingdom. Unilever, which includes the Suave brand, is a Delaware corporation with its principal place of business located at 700 Sylvan Avenue, Englewood Cliffs, New Jersey 07632. Unilever manufactured, marketed, designed, promoted and/or distributed the Products.

27.     Defendant Conopco is a New York corporation with its principal place of business located at 700 Sylvan Avenue, Englewood Cliffs, New Jersey 07632. Upon information and belief, Conopco is responsible for the distribution of the manufactured Products to retailers. At all times relevant hereto, Conopco knew or should have known that the Products would be sold in the United States.

## JURISDICTION AND VENUE

28.     This Court has personal jurisdiction over Defendants in this matter. The acts and omissions giving rise to this action occurred in the state of Illinois. Defendants have been afforded due process because they have, at all times relevant to this matter, individually or through their agents, subsidiaries, officers and/or representatives, operated, conducted, engaged in and carried

8

on a business venture in this state and/or maintained an office or agency in this state, and/or marketed, advertised, distributed and/or sold products, committed a statutory violation within this state related to the allegations made herein, and caused injuries to Plaintiff and putative Class Members, which arose out of the acts and omissions that occurred in the state of Illinois, during the relevant time period, at which time Defendants were engaged in business activities in the state of Illinois.

29.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more putative Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one Plaintiff and Defendants are citizens of different states. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

30.     Pursuant to 28 U.S.C. § 1391(a), venue is proper because a substantial part of the events giving rise to the claims asserted occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendants conduct substantial business in this District, have sufficient minimum contacts with this District, and otherwise purposely avail themselves of the markets in this District, through the promotion, sale, and marketing of the Products in this District.

## FACTS COMMON TO ALL CLASS MEMBERS

### A.  Unilever's Business.

31.     In 1930, Unilever was formed from the merger of two competitors, Margarine Union and Lever Brothers Limited, who were in the business of household goods.[8]

32.     Given the founding companies long marketing and trade histories, Unilever boasts

---

[8] https://www.unilever.com/Images/the-formation-of-unilever_tcm244-520314_en.pdf (Last Accessed October 21, 2020).

that its group has been "pioneers, innovators and future-makers for over 120 years,"[9] beginning largely in part with the launch of the first branded soap.[10]

33.     Currently, Unilever's business consists of:[11]

    a.     400+ Unilever brands used worldwide;

    b.     2.5 billion users of the products daily;

    c.     190 countries where brands are sold; and

    d.     €52 billion turnover in 2019.

34.     Unilever's brands include numerous well-known companies in Beauty and Personal Care, Foods and Refreshment, Home Care, and Water Purifiers. In addition to TRESemmé, Unilever's brands include Suave, St. Ives, Dove, Clear, Pond's Q-tips, and Simple.

35.     In 2010, Unilever acquired US-based Alberto Culver Company for US $3.7 billion in cash. The Alberto Culver acquisition included many large beauty brands, including TRESemmé. At the time of the announcement, Unilever claimed that the "acquisition makes Unilever the world's leading company in hair conditioning, the second largest in shampoo and the third largest in styling…"[12]

36.     Unilever represents itself and its brands to be a global "ambassador for [its] high ethical standards."[13]

37.     Unilever sells and distributes TRESemmé in more than a dozen countries, including the US, and represents that "TRESemmé is a haircare brand offering salon-quality products for

---

[9] https://www.unilever.com/about/who-we-are/about-Unilever/ (Last Accessed October 8, 2020).
[10] https://www.unilever.com/about/who-we-are/our-history/#timeline+2D+515781+open (Last Accessed October 8, 2020).
[11] https://www.unilever.com/about/who-we-are/about-Unilever/ (Last Accessed October 8, 2020).
[12] https://www.unilever.com/news/press-releases/2010/10-09-27-Unilever-to-acquire-Alberto-Culvert.html. (Last Accessed October 21, 2020).
[13] www.unilever.com/about/who-we-are/our-values-and-principles/business-integrity/ (Last Accessed October 21, 2020).

men and women. It has its origins in hair salons, dating back over 60 years, and now has a range of hair-styling products for use at home."[14]

38.     As part of its TRESemmé brand, Unilever sells the keratin Products at issue here.

**B.  DMDM Hydantoin.**

39.     Keratin is a type of protein found in hair and nails, and is added to hair products to straighten and strengthen hair, as well as reduce frizz.

40.     As protein is food for microbes, keratin hair products would spoil and have an abbreviated shelf life without added preservatives to extend the life of the product.

41.     There are numerous preservatives that are used in cosmetics and hair products, including formaldehyde donors; many of which have been linked to the development of allergies, dermatitis, hair loss, and even cancer.

42.     Specifically, formaldehyde donors are preservatives that are "added to water-containing cosmetics (which includes personal care products/toiletries) to prevent the growth of micro-organisms that may enter during manufacture or during their usage."[15]

43.     Despite having intimate knowledge of the risks of using formaldehyde donor preservatives, Unilever continues to use formaldehyde donors, DMDM hydantoin (also known as DMDM-h) and sodium hydroxyl, in its products.[16] Until recently, DMDM hydantoin was used as a preservative in the Products at issue.

44.     "DMDM hydantoin (dimethylodimethyl hydantoin) is a formaldehyde donor used

---

[14] https://www.unilever.com/brands/?category=408114&brand=412548-410037 (Last Accessed October 21, 2020).
[15] de Groot AC, White IR, Flyvholm MA, Lensen G, Coenraads PJ. Formaldehyde-releasers in cosmetics: relationship to formaldehyde contact allergy. Part 1. Characterization, frequency and relevance of sensitization, and frequency of use in cosmetics. Contact Dermatitis. 2010 Jan;62(1):2-17. doi: 10.1111/j.1600-0536.2009.01615.x. PMID: 20136875.
[16] https://www.unilever.com/brands/Our-products-and-ingredients/Your-ingredient-questions-answered/Formaldehyde-donors.html (Last Accessed October 26, 2020).

as a preservative in cosmetic products at concentrations up to 1%."[17] In other words, it is a formaldehyde-releasing preservative ("FRP"). used to lengthen the shelf life of personal care products, including hair products.

45.     "An important source of human skin contact with formaldehyde is the use of cosmetics containing formaldehyde-releasers as preservatives."[18]

46.     In personal care products, such as shampoo, "formaldehyde can be added directly, or more often, it can be released from preservatives such as… DMDM hydantoin." Specifically, the formaldehyde donor will "release small amounts of formaldehyde over time."[19]

47.     "In 1984, DMDM hydantoin ranked 9th in the list of the most frequently used cosmetic preservatives in the USA."[20] By 1987, DMDM hydantoin was included in approximately 115 product formulas filed with the FDA, most frequently in shampoos.[21]

48.     "DMDMH was the 21st most common allergen in the 2005-2006 NACDG standard series. DMDMH is a preservative that contains 0.5% to 2% free formaldehyde and over 17% combined formaldehyde."[22]

49.     For many decades, since the 1970's, if not earlier, studies and patch tests were being

_____

[17] "Patch test reactivity to DMDM hydantoin, Relationship to formaldehyde allergy." By Anton C. DeGroot, Theodoor Van Joost, Jan D. Bos, Harrie L.M. Van Der Meeren, and J. Willem Weyland (*Contact Dermatitis*, 1988, 18:197-201).
[18] de Groot AC, White IR, Flyvholm MA, Lensen G, Coenraads PJ. Formaldehyde-releasers in cosmetics: relationship to formaldehyde contact allergy. Part 1. Characterization, frequency and relevance of sensitization, and frequency of use in cosmetics. Contact Dermatitis. 2010 Jan;62(1):2-17. doi: 10.1111/j.1600-0536.2009.01615.x. PMID: 20136875.
[19] http://www.safecosmetics.org/get-the-facts/chemicals-of-concern/formaldehyde/ (Last Accessed October 21, 2020).
[20] "Patch test reactivity to DMDM hydantoin, Relationship to formaldehyde allergy." By Anton C. DeGroot, Theodoor Van Joost, Jan D. Bos, Harrie L.M. Van Der Meeren, and J. Willem Weyland (Contact Dermatitis, 1988, 18:197-201).
[21] *Id.*
[22] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2958195/ (citing Rietschel RL, Fowler JF., Jr . Fisher's Contact Dermatitis. 5th ed. Philadelphia: Lippincott Williams & Wilkins; 2001).

performed to determine human reactivity to DMDM hydantoin,[23] including specifically the "relationship between contact allergy to formaldehyde," including "test reactions to DMDM hydantoin."[24]

50.     One study performed in 1987 specifically examined "whether the presence of DMDM hydantoin in cosmetics may cause adverse effects in patients pre-sensitized to formaldehyde."[25] The conclusion even more than twenty years ago was that "aqueous solutions of DMDM hydantoin, in concentrations comparable to those used in cosmetic products, contain enough free formaldehyde to cause dermatitis…," and that despite earlier conclusions that DMDM hydantoin is a safe cosmetic ingredient, "data suggest that an increase in the use of this preservative may also increase the risk of cosmetic dermatitis in patients allergic to formaldehyde."[26] The authors further suggest that cosmetic products with FRPs should have warnings that the products "'contain formaldehyde'… whether present as free formaldehyde or bound by a donor."[27]

51.     Several more recent studies, including a 2015 study "determined that longer storage time and higher temperature increase the amount of formaldehyde released from FRPs and could ultimately lead to more severe health concerns."[28]

52.     In other words, "reactions that generated formaldehyde occur silently as the

---

[23] Tudela E, MacPherson C, Maibach HI. Long-term trend in patch test reactions: a 32-year statistical overview (1970-2002), part II. Cutan Ocul Toxicol. 2008;27(3):187-202. doi: 10.1080/15569520802143436. PMID: 18988088.

[24] "Patch test reactivity to DMDM hydantoin, Relationship to formaldehyde allergy." By Anton C. DeGroot, Theodoor Van Joost, Jan D. Bos, Harrie L.M. Van Der Meeren, and J. Willem Weyland (Contact Dermatitis, 1988, 18:197-201).

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] http://www.safecosmetics.org/get-the-facts/chemicals-of-concern/formaldehyde/ (Last Accessed October 21, 2020)(citing Lv, C., Hou, J., Xie, W., & Cheng, H. (2015). Investigation on formaldehyde release from preservatives in cosmetics. International journal of cosmetic science.).

products sit on shelves in stores or bathroom cabinets."[29]

53.    Formaldehyde is a known human carcinogen and is recognized as such by the United States National Toxicology Program and the International Agency for Research on Cancer.[30]

54.    In 2009, prior to the sale of the Products, "a review of the literature on occupational exposures and formaldehyde shows a link between formaldehyde and leukemia."[31]

55.    With specific regard to FRPs, like DMDM hydantoin, "the formaldehyde released from FRPs has been linked to cancer, but there is little evidence that FRPs directly cause cancer. However, a mixture of the FRP bromopol and amines, which form nitrosamines, has been found to penetrate skin and cause cancer."[32]

56.    Further, a study in 2010 concluded that although "[i]t has been long accepted that formaldehyde-releaser sensitization is attributable to released formaldehyde. However, clinical studies show the existence of patients allergic to formaldehyde-releasers but not to formaldehyde itself."[33] That same study found DMDM hydantoin to be "reactive per se."

57.    Consequently, it is unsurprising that DMDM hydantoin is considered by the U.S.

---

[29] https://www.ewg.org/research/exposing-cosmetics-cover-up#formaldehyde (Last Accessed October 21, 2020).

[30] http://www.safecosmetics.org/get-the-facts/chemicals-of-concern/formaldehyde/ (Last Accessed October 21, 2020)(citing International Agency for Research on Cancer. "IARC classifies formaldehyde as carcinogenic to humans." Press release. June 15, 2004. Accessed January 9, 2009.).

[31] http://www.safecosmetics.org/get-the-facts/chemicals-of-concern/formaldehyde/ (Last Accessed October 21, 2020)( Zhang et al 2009. Meta-analysis of formaldehyde and hematologic cancers in humans. Mutation Research 681: 150-168).

[32] http://www.safecosmetics.org/get-the-facts/chemicals-of-concern/formaldehyde/ (Last Accessed October 21, 2020)(citing to http://www.cosmeticsinfo.org/nitrosamines. Accessed September 23, 2015).

[33] Kireche M, Gimenez-Arnau E, Lepoittevin JP. Preservatives in cosmetics: reactivity of allergenic formaldehyde-releasers towards amino acids through breakdown products other than formaldehyde. Contact Dermatitis. 2010 Oct;63(4):192-202. doi: 10.1111/j.1600-0536.2010.01770.x. Epub 2010 Aug 20. PMID: 20731691.

Food & Drug Administration as one of the top allergens "that cause the most allergic reactions from the use of cosmetic products."[34]

58.     Specifically, DMDM hydantoin can "trigger the immune system to release chemical substances such as antibodies," resulting in reactions such as itchiness, red rashes on the skin, or more extreme reactions.[35]

59.     Further, as a person becomes more exposed to an irritant over time, including DMDM hydantoin, the likelihood and severity of the reaction increase. This is called irritant contact dermatitis ("ICD"), which "can occur in any person if the amount and duration of irritant exposure are sufficient to cause direct epidermal keratinocyte damage."[36]

60.     Likewise, the irritation of the scalp, including dermatitis, has been linked to hair brittleness and hair loss. Specifically,

> [A number of observations have found that premature hair loss may be caused by the poor scalp health associated with either dandruff and seborrheic dermatitis, or psoriasis, indicating that the effect on the preemergent hair fiber may alter the anchoring force of the fiber with the follicle, as evidenced by an increased proportion both of catagen and telogen, and of dysplastic anagen hairs (anagen hairs devoid of hair root sheaths) in the trichogram (hair pluck).[37]

61.     In 2012, beauty product manufacturer Johnson & Johnson announced that it would "remove a host of potentially harmful chemicals, *like formaldehyde*, from its line of consumer products by the end of 2015."[38] [Emphasis Added].

---

[34] https://www.fda.gov/cosmetics-ingredients/allergens-cosmetics (Last Accessed October 21, 2020).
[35] https://www.fda.gov/cosmetics-ingredients/allergens-cosmetics (Last Accessed October 21, 2020).
[36] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2958195/
[37] Trueb, Ralph M., Henry, Jim P., Davis, Mike G., and Schwartz, Jim R., Scalp Condition Impacts Hair Growth and Retention via Oxidative Stress, Int J Trichology. 2018 Nov-Dec; 10(6): 262–270, doi: 10.4103/ijt.ijt_57_18.
[38] https://www.nytimes.com/2012/08/16/business/johnson-johnson-to-remove-formaldehyde-from-products.html

62.    Like many other beauty manufacturers, Unilever has been using DMDM hydantoin as a preservative in its products since at least 2011;[39] however, unlike many manufacturers moving away from toxic ingredients, Unilever continues to use this formaldehyde donor today, specifically representing:

> We use preservatives to keep home and personal care products in good condition: without them, they could be spoiled by bacteria, yeasts and molds. We choose our preservative ingredients carefully, making sure they are safe and effective for people who use our products.[40]

63.    Notably, despite proudly continuing to use FRPs in its products, Unilever specifically notes that they are not used in baby care products.[41]

64.    As Unilever is aware, there is a litany of alternative preservatives that can be used in shampoos and cosmetics that do not release known human carcinogens and are non-synthetic, including:

        a.   Glyoxylic acid (or derivatives thereof);

        b.   Potassium sorbate and sorbic acid;

        c.   Citric acid and its salts;

        d.   Rosemary oil extract;

        e.   Neem oil extract;

        f.   Lavender oil;

        g.   Grapefruit seed extract;

        h.   Vinegars; and

        i.   Others.

---

[39] *Reid, et al. v. Unilever United States, Inc., et al.*, 1:12-cv-06058 (N.D.Ill.), Dkt. No. 60.
[40] https://www.unilever.com/brands/Our-products-and-ingredients/Your-ingredient-questions-answered/index.html (Last Accessed October 21, 2020).
[41] https://www.unilever.com/brands/Our-products-and-ingredients/Your-ingredient-questions-answered/Formaldehyde-donors.html (Last Accessed October 26, 2020).

65.     In addition to these alternatives, Unilever also could have used lower levels of DMDM hydantoin; however, the risk of development and exacerbation of sensitivity or allergic reaction would still exist through repeated and prolonged use.

66.     Upon information and belief, Unilever has recently begun to use alternative preservatives in the Products; however, authorized retailers continue list DMDM hydantoin as an ingredient on their websites.

## C. Unilever's Knowledge of DMDM Hydantoin Causing Hair Loss, Rashes, and Scalp Irritation.

67.     On August 1, 2012, a lawsuit was filed against Unilever related to its Suave® Keratin Infusion 30-day Treatment. In part, the lawsuit involved the allegations that,

> despite the express representation that the Treatment contains no Formaldehyde, the Treatment does contain DMDM Hydantoin, a chemical that is known as a "Formaldehyde-releaser." *See* http://www.safecosmetics.org/article.php?id=599. Formaldehyde releasers are sometimes used in cosmetics in place of formaldehyde and release small amounts of Formaldehyde over time. Formaldehyde is a known human carcinogen.[42]

68.     Like the TRESemmé Products at issue here, the Suave product was causing "hair loss upon proper application,"[43] as well as scalp irritation and related conditions.

69.     Like the TRESemmé Products at issue here, Unilever failed to warn consumers that use of the Suave products could cause the scalp reactions and hair loss being reported by consumers.

70.     Accordingly, notwithstanding Unilever has been in the business of manufacturing cosmetics and hair products for nearly 100 years and the decades long studies on reactivity to DMDM hydantoin, at a minimum Unilever was on notice since the Suave lawsuit filed in 2012 that its products containing DMDM hydantoin were cause scalp irritation and hair loss.

---

[42] *Reid, et al. v. Unilever United States, Inc., et al.*, 1:12-cv-06058 (N.D.Ill.), Dkt. No. 1, ¶ 23.
[43] *Id.* at ¶ 26.

**D. For Years, Consumers Have Voiced Their Complaints About the Products.**

71.     Since at least 2013, Unilever became aware through consumer complaints that its

TRESemmé Keratin Products were causing scalp irritation and hair loss.

72.     A sample of complaints posted on Amazon.com detail scalp reactivity and hair loss

follows:

- *Star rating unknown.* **BEWARE!**
  - o   Reviewed in the United States on July 28, 2013
  - o   "I tried this shampoo for two weeks. I wash my hair about three times a week. In that short amount of time, I lost ALOT of hair. I have thick, wavy and used to have TONS of hair. After using this product, I noticed a huge difference in the amount of hair I was losing daily. It is now very dry, brittle and my scalp started to itch. I was using Loreal sulfate free smoothing shampoo and conditioner before this. I wanted to try something different as I flat iron my hair quite frequently. Boy do I regret it! All I can say is BEWARE. It does smoothe your hair by thinning it out! Pay close attention to the amount of hair you are losing in the shower and throughout the day! It DOES matter!"

- *1.0 out of 5 stars* **Hair shedding**
  - o   Reviewed in the United States on November 23, 2013
  - o   "This product seemed find [sic] at first. I'm trying to grow my hair out and I thought that this would help keep it healthy and was doing everything I was told to do but still my hair was coming out in chunks. I changed shampoos and as soon as I did my hair wasn't Coming out in chunks. I ran out of shampoo so I was forced to go back to this one and My hair began to shed horridly again. I threw this over my balcony."

- *1.0 out of 5 stars* **garbage!!!!**
  - o   Reviewed in the United States on January 14, 2015
  - o   "I have kinky coily hair and they were giving this shampoo and its conditioner out at my job. And I am appalled that they would even think this stuff was good enough to give out. My hair was nice and soft before this went in. It completely stripped my hair of its natural oils... **My hair started falling out immediately.** I had to pile in the shampoo to undo the mess it did to my hair. WOW!!!"

- *1.0 out of 5 stars* **Causes Signficant Hair Loss - Do not buy!**
  - o   Reviewed in the United States on July 10, 2015
  - o   "Absolutely horrible shampoo! At first I got it because the name of it intrigued me. I have thin, dry, wavy hair and was looking for something that would help control my hair's extremely frizzy texture. At first I loved this shampoo and the scent is really nice too.

18

**However, within a couple weeks of use, I noticed chunks of my hair falling out. I did some research on this shampoo and noticed others who said similar things after trying it.** I'm so disappointed because this is thinning out my already thin hair. Seriously this causes a lot of hair loss, do not buy!"

- *1.0 out of 5 stars* <u>**I dont recommend this to anyone**</u>
  - Reviewed in the United States on July 20, 2016
  - "I dont recommend this to anyone. **My hair started falling down after using this shampoo.** waste of money. I am going to throw it to the dustbin. Please dont buy if you dont want your hair to be fallen."

- *2.0 out of 5 stars* <u>**Causes problems**</u>
  - Reviewed in the United States on August 23, 2018
  - "Horrible products.The shampoo for color treated hair makes my hair pull out and my scalp itches."

73.   Similar complaints have been reported through www.BJs.com for at least six years.

A sampling of these follows:

- **causing sores on my scalp  Submitted 5 years ago   By tarah**
  - I love the smell it's amazing but it's been causing sores on my scalp and my hair has been falling out. I'm really concerned.  It makes my scalp feel weak and thinning.

- **Worst shampoo I've ever used   Submitted 5 years ago  By ReneeO**
  - I have used alot of different shampoos from drugstore to high end and this is the absolute worst! It made me lose hair and my scalp dry out and itch like crazy, and its been two weeks and my scalp is still recovering. My scalp is so itchy that I have been itching it my sleep. I have thick, coarse, healthy hair and nothing has ever made my hair and scalp feel worse. My stylist always comments that my hair is healthy until I used this.

- **Terrible product  Submitted 5 years ago  By Mlynn5**
  - I've used TRESemmé in the past. But this product was terrible, my hair started breaking off and falling out after two weeks of using it! My hair is now thin! I will never use TRESemmé products again!

- **Worst product I've ever used!  Submitted 4 years ago By Unhappycurlz**
  - I decided to try out this shampoo and conditioner thinking it would be good for my curly hair. Boy was I wrong! It didn't make my curls look any different except for now my hair is a lot thinner! Hair consistently falls out In the shower. I know it's from this product

19

because it started happening once I switched to it.

74.     Like Amazon and BJ's, people across the world began to issue similar complaints

for at least three years and as recently as four months ago on PRODUCTREVIEW.COM:[44]

- "Worst i've used so far" – posted 3 years ago
  - I have to usually have to switch shampoos every three months or so i thought TRESemmé would be the exception but i was wrong not only did it make my scalp itchy as hell it also has been making my hair fall out so now on the sides it looks like it's thining never buying this product again!

- "Awful!!!!" – posted 3 years ago
  - I used these products and they made me lose more hair and my scalp was so itchy ( wake me up in the middle of the night itchy) I thought I had head lice. So I figured I was allergic and stopped using it.... my daughter started to use it so we didn't waste it. She had the same reaction as well as her friends that use it.  We are throwing it away right now

- "My hair is falling out!" – posted 3 years ago
  - I've been using this product for roughly 3 months. I couldn't figure out why I started losing so much hair. Well I finally came to realize it's this. Thanks TRESemmé!

- "OMFG TEARS!"  - posted 2 years ago from Shomari in Kansas City, MO
  - This product caused a lot of hair loss for me. I've never had anything like this happen to me, I literally have a big bald spot in the middle of my head! And the shedding will not stop, I've only used this product once, about four days ago. This is the worst product I have ever used in my LIFE!!!

- "Made my hair fall out within a week!!" – posted 2 years ago
  - Bought this because their classic TRESemmé (black bottle) has always been good. Well, after a week my hair was literally falling out...CLUMPS in my hand and clogged my shower 3 times in one shower. Also made my hair staticky and dry feeling. I'm not sure I'll ever use their product again!!

- "Terrible..Itchy scalp! Need to sue this shampoo maker!"  - posted 4 months ago
  - Using this shampoo since last 3 months and I realized I was feeling itchy scalp. However hair is smoother. Trust me it literally made my scalp dry and itchy and sometimes I literally couldn't sleep. It took me some time and I searched over web to find if others are feeling the same and it's true that many others feeling the same. Worst product!!

---

[44] https://www.productreview.com.au/listings/TRESemmé-keratin-smooth-shampoo-and-conditioner

75.     In addition to the numerous consumer complaints regarding scalp irritation and hair loss, the Products have been the topic of several blogs.

76.     In one blog, written by a pharmacist, she concludes her review and list of reactions by stating "my hair was falling out pretty massively. So it wasn't just in my head. I also checked out other people's opinion – and it seems that TRESemmé really causes hair loss to some."[45]

77.     Thus, Unilever was on notice of the problems with the Products since at least 2013 as evidenced by the plethora of consumer complaints throughout the Internet related to the Products causing skin irritation and/or hair loss.

**E.  The TRESemmé Products and the Products' Warranties.**

78.     Unilever released TRESemmé Keratin Products more than seven years ago. The Products were sold by Unilever directly and through retail shops to consumers nationwide, including in Illinois.

79.     The Products state, on the front of the bottles' labels, that the Products are formulated with lush Marula oil and Keratin to offer five smoothing benefits in one system, including "anti-frizz", "detangles", "shine", "softness", and "tames fly-aways". Below that statement is printed in all caps: "PRO COLLECTION SHAMPOO" or On the back of the bottles, you will find the question "WHY PRO COLLECTION?" followed by the answer, "Get great hair foundation, whatever your style, with our Pro Technology system." The back of the bottles also state: "Smooth doesn't have to be straight. You want hair that is shiny, silky AND smooth. You want hair that moves."

80.     Keratin is a protein found naturally in hair. By promoting the Products as the revamped TRESemmé Keratin Smooth Collection "with powerful Keratin, specially formulated to

---

[45] https://howtogetgreathair.com/TRESemmé-keratin-infusing-shampoo-review/

give you noticeably smooth, manageable hair that keeps frizz on the fringe for up to 72 Hours", Unilever warranted the Products as safe, non-toxic hair smoothing solutions that could be purchased at a fraction of the price of a salon treatment. Furthermore, Unilever explicitly states "this salon-quality conditioner nourishes each strand to leave hair silky, shiny and totally under your control."

81.     Plaintiff and the Class did not and would not expect that application of the Products would cause hair loss and scalp irritation upon proper application.

82.     Plaintiff and the Class reasonably expected a warning regarding any potential hazard to consumers, especially because the Food, Drug and Cosmetic Act regulations provide that cosmetics that may be hazardous to consumers must bear appropriate warnings. *See* http://www.fda.gov/Cosmetics/CosmeticLabelingLabelClaims.

83.     Contrary to the Food, Drug and Cosmetic Act regulations, the Products also failed to provide adequate directions for safe use, although Defendants knew or should have known the Products would be unsafe if used incorrectly. In fact, Unilever's website affirmatively represents that it complies with all applicable labeling laws. *See* Unilever's Code of Business Principles and Code Policies, at 6.[46]

84.     In response to the damage customers have suffered after using the Products, consumers complained as described *supra.*

85.     There are hundreds of posts highlighting the "horror stories" of women who used the Products. These stories are strikingly similar to Plaintiff's experiences. These consumers describe how they were misled by Unilever's representations about the Products, expecting salon-

---

[46] *See* https://www.unilever.com/Images/code-of-business-principles-and-code-policies_tcm244-409220_en.pdf. (noting "Unilever companies and employees are required to comply with the laws and regulations of the countries in which we operate.") (last accessed on November 16, 2020).

22

quality, Keratin-based, smoothing shampoo whose effects would 1) Give consumers noticeably smooth, manageable hair that keeps frizz on the fringe for up to 72 Hours and 2) Nourish each strand to leave hair silky, shiny and totally under the consumer's control, but instead received a toxic Product that caused hair loss and other adverse effects.

86.     Unilever continues to this day to advise consumers that these Products are safe to use as directed, without providing any disclosure concerning the complaints of hair loss and with no warnings regarding the hair loss that may result from their continued use. Indeed, despite Unilever's knowledge and awareness of hundreds if not thousands of complaints of significant hair loss and breakage caused by the Products, Unilever continues to claim the use of DMDM hydantoin it is safe and permits them to be sold to this day — without providing consumers with *any* revised warnings or disclosures.

87.     The Products are marketed as providing five smoothing benefits in one system, and are sold at retail stores such as CVS, Target, Walgreens, and Walmart, and through e- commerce websites such as Amazon.com, CVS.com, Target.com, Walgreens.com, and Walmart.com.

88.     Defendants manufacture, advertise, market, distribute and sell the Products throughout the United States, including in Illinois. The Products are sold in one size only — 22 fl. oz.

**F.  Defendants' False and Deceptive Advertising and Labeling of the Products.**

89.     In violation of 21 U.S.C. § 362(a) and 21 C.F.R. § 701.1(b), Defendants have consistently, falsely and deceptively advertised and labeled the Products in an effort to make consumers believe that the Products' ingredients, including DMDM hydantoin, were safe for use.

90.     Since launching the Products, Defendants have consistently conveyed their uniform, deceptive message to consumers throughout the United States, including the state of Illinois, that the Products formulated with formaldehyde donors, including DMDM hydantoin, are

safe for use.

91.     These uniform deceptive claims have been made and repeated across a variety of media including Defendants' Products' labels, websites and online promotional materials, and at the point-of-purchase, where they cannot be missed by consumers. In truth, Defendants' claims that DMDM hydantoin is a safe ingredient is false, misleading, and deceptive because the Products' ingredients, including DMDM hydantoin, were not safe, caused serious scalp irritation and hair loss, and do not safely smooth, nourish, cleanse, and/or repair hair.

92.     Upon information and belief, Unilever knowingly permitted the manufacture and sale of Products that were dangerous and unfit for sale as temporary hair "smoothing" Products.

93.     Prior to placing the Products into the stream of commerce for sale to Plaintiff and the Class, Defendants were aware or should have been aware that the Products contained one or more unsafe ingredients, including DMDM hydantoin, that caused significant hair loss and scalp irritation upon proper application and that any instructions and warnings provided with the Products directly to consumers were materially insufficient.

94.     Defendants, including Unilever, knew or but for their reckless indifference would have known, prior to Plaintiff and the Class's purchases of the Products that they would continue to receive complaints of hair loss attributed to the Products. Based on their experience and the prior *Suave* litigation, Defendants knew or should have known that even if they diligently investigated the problem, it would be difficult if not impossible to remediate the problem.

95.     Defendants, including Unilever knew, or but for their reckless indifference would have known, that: (a) the risk of scalp irritation and hair loss was substantial, if not a certainty, (b) Unilever's customers were unaware of that substantial risk, and (c) those customers had a reasonable expectation that Unilever would not sell the Products under those conditions.

96.     Despite such knowledge, Defendants did not disclose to prospective purchasers,

that there was a substantial risk of scalp irritation and hair loss associated with use of the Products. Defendants instead continued to claim that the Products' ingredients, including DMDM hydantoin, were safe, while concealing all the adverse reports filed by consumers.

97. The labels on the back of each Product perpetuate the false, deceptive and misleading representations and claims. Specifically, the back labels of the Products represent "Our Keratin Smooth system, with **MARULA OIL**, *gently cleanses* and nourishes hair." (Emphasis Added).

98. However, despite the representation that the Products "gently" cleanse, they contain one or more ingredients, including DMDM hydantoin, that cause scalp irritation and hair loss.

99. Defendants further represent that DMDM hydantoin is safe for use in its products; however, acknowledge that these FRPs are not used in baby care products.[47]

100. Defendants reinforce the false and deceptive claims that the Products "nourish" the hair and leave it in good condition through the websites of various authorized retailers:

> **Keratin Smooth Color Shampoo**
>
> Our revamped TRESemmé Keratin Smooth system now features a color-treated option with luxurious Moroccan oil and delivers not one but five smoothing benefits so you can forget the frizz and indulge in gorgeously silky hair for up to 72 hours.*
>
> **Product Details**
>
> Silky smoothness with bountiful body? Who says you can't have it all? Our unique TRESemmé Keratin Smooth Color System, with Keratin and Moroccan Argan Oil, helps to control frizz while keeping your style effortlessly smooth. Not to mention, this double-duty system helps protect your color-treated hair, leaving it gorgeously sleek and vibrant.
>
> Start your routine with the TRESemmé Keratin Smooth Color Shampoo, formulated with rich Moroccan Argan oil and Keratin. This low-sulfate

---

[47] https://www.unilever.com/brands/Our-products-and-ingredients/Your-ingredient-questions-answered/Formaldehyde-donors.html (Last Accessed October 27, 2020).

shampoo cleanses gently your colored hair, smoothing frizz from root to tip, while sealing in shine to keep your colored hair vibrant.

**How To Use**

- Apply to wet hair, gently massage the scalp and roots with fingertips to work into a lather.

- Lightly squeeze the shampoo from roots to ends and rinse thoroughly.

- Finish with TRESemmé Keratin Smooth Color Conditioner and style with your favorite TRESemmé products.

- For protections from heat styling tools, us TRESemmé Keratine Smooth Heat Protection Spray before you style.

**How It Works**

Keratin Color Shampoo is formulated to leave your hair gorgeously sleek and control frizz.

https://www.tresemme.com/us/en/products/shampoo/keratin-smooth-color-shampoo.html (emphasis added) (last visited October 28, 2020).

**Keratin Smooth Shampoo**

Our redesigned formula with luxurious Marula oil delivers not one, but five smoothing benefits so you can forget the frizz and indulge in gorgeously silky hair for up to 72 hours.*
*TRESemmé Keratin Smooth Shampoo and Conditioner system vs. non-conditioning.

**Product Details**

Don't let unruly frizz ruin your style. When it comes to control, you should never have to compromise smooth for limp, poker straight hair.

Specially formulated to fight frizz, detangle knots, boost shine, add silky softness and tame those pesky flyaways, TRESemmé Keratin Smooth, with Keratin and lush Marula oil from Africa, gives you five smoothing benefits in one system, for hair that's silky smooth but still full of natural movement.

**How To Use**

- Apply to wet hair, gently massage the scalp and roots with fingertips to work into a lather.

- Lightly squeeze the shampoo from roots to ends and rinse thoroughly.

26

- Finish with TRESemmé Keratin Smooth Conditioner and style with your favorite TRESemmé products.

- For protection from heat styling tools, use <u>TRESemmé Keratin Smooth Heat Protection Spray</u> before you style.

**How It Works**

Keratin shampoo is formulated to leave your hair gorgeously sleek and control frizz.

<u>https://www.TRESemmé.com/us/en/products/shampoo/keratin-smooth-shampoo.html</u>  (emphasis added) (last visited September 11, 2020).

## G.  The Impact of Defendants' False, Misleading and Deceptive Advertising.

101.   Defendants intended for consumers to rely upon the representations on the Products' labels, and reasonable consumers, including Plaintiff and the Class, did, in fact, so rely. These representations are often the only source of information consumers can use to make decisions concerning whether to buy and use such products.

102.   Consumers lack the ability to test or independently ascertain the genuineness of product claims of normal everyday consumer products, especially at the point-of-sale. Reasonable customers must therefore rely on consumer product companies, such as Defendants, to honestly represent their Products and the Products' attributes on the Products' labels.

103.   At all relevant times, Defendants directed the above-referenced Products' labels, statements, claims and innuendo, including that the Products "gently" smoothed, cleansed, nourished, and repaired the hair, that the ingredients were safe, to consumers in general and Plaintiff and all Class Members in particular, as evidenced by their eventual purchases of the Products.

104.   Plaintiff and Class Members did reasonably rely on Defendants' Product labels, statements, claims and innuendo in deciding to purchase the Products and were thereby deceived.

105.   As a result of Defendants' deceptive labeling and/or marketing campaign,

Defendants have caused Plaintiff and putative Class Members to purchase the Products, which contained one or more unsafe ingredients, including DMDM hydantoin, and do not safely smooth, nourish, cleanse, and/or repair hair. Plaintiff and putative Class Members have been harmed, as they would not have purchased the Products had they known the Products were not safe and would cause scalp irritation and hair loss.

106. As a result of Defendants' misconduct, Defendants were able to sell the Products to at least thousands of consumers throughout the United States— including Plaintiff and putative Class Members—and realized sizeable profits.

107. Plaintiff and putative Class Members were harmed and suffered actual damages in that Plaintiff and putative Class Members did not receive the benefit of their bargain as purchasers of the Products, which were represented as safe and can safely smooth, nourish, cleanse, and/or repair hair. Indeed, Plaintiff and putative Class Members did not receive the benefit of their bargain after purchasing the Products, as Plaintiff and putative Class Members paid for Products that were unsafe, cause scalp irritation and hair loss, and do not safely smooth, nourish, cleanse, and/or repair hair.

108. Defendants developed and knowingly employed a labeling, advertising and/or marketing strategy designed to deceive consumers into believing that the Products contain safe ingredients and can safely smooth, nourish, cleanse, and/or repair hair.

109. The purpose of Defendants' scheme is to stimulate sales and enhance Defendants' profits.

110. As the manufacturers, marketers, advertisers, distributors and/or sellers of the Products, Defendants possess specialized knowledge regarding the Products and the content of the ingredients contained therein. In other words, Defendants know exactly what is – and is not –

contained in the Products, at what levels, and are safe or unsafe.

111.   Defendants knew or should have known, but failed to disclose, that the Products contain one or more unsafe ingredients, including DMDM hydantoin, and do not safely smooth, nourish, cleanse, and/or repair hair,  as labeled and/or marketed by Defendants.

112.   Plaintiff and putative Class Members were, in fact, misled by Defendants' labeling, representations and marketing of the Products.

113.   The unsafe ingredient(s) and the inability of the Products to safely smooth, nourish, cleanse, and/or repair hair, leave no reason to purchase these Products at all, since other proven and safer  comparably priced products exist.

114.   The Products are defined as "cosmetics" under 21 U.S.C.S. § 321(i) of the Federal Food Drug & Cosmetic Act ("FDCA").

115.   Defendants' deceptive statements violate 21 U.S.C.S. § 362(a), which deems a cosmetic product misbranded when the label contains a statement that is "false or misleading in any particular."

116.   The FDA promulgated regulations for compliance with the FDCA at 21 C.F.R. §§ 701 et seq. (for cosmetics).

117.   The introduction of misbranded cosmetics into interstate commerce is prohibited under the FDCA and all parallel state statutes cited in this Complaint.

118.   Also, the Illinois Consumer Fraud and Deceptive Business Practices Act protects Defendants' consumers, and provides:

§ 2. Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise,

29

misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

119.   Plaintiff and putative Class Members would not have purchased the Products had they known the Products contained one or more unsafe ingredients and are incapable of safely smoothing, nourishing, cleansing, and/or repairing hair.

## PLAINTIFF CASTILLO'S FACTUAL ALLEGATIONS

120.   Plaintiff Castillo, age 22, purchased the Products on February 7, 2020 from target.com for approximately $8.99 and picked the Products up at a Target brick and mortar store in Algonquin, Illinois. Before purchasing the Products, Plaintiff Castillo reviewed information about the Products on the Products' labels and the fact that the Products were being sold for personal use, and not resale. At the time of purchasing her Products, Plaintiff Castillo also reviewed the accompanying disclosures, warranties, and marketing materials, and understood them as representations and warranties by Defendants that the Products were safe to smooth, nourish, cleanse, and/or repair hair. Plaintiff Castillo relied on these representations and warranties in deciding to purchase Defendants' Products. Accordingly, these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Products had she known these representations were not true. Here, Plaintiff did not receive the benefit of her bargain because Defendants' Products are not safe to smooth, nourish, cleanse, and/or repair hair.

121.   Plaintiff Castillo purchased the Products because she wanted smooth hair.

122.   Before using the Products, Plaintiff Castillo followed the instructions on the

Products' labels, as directed by Defendants.

123.    After using the Products as intended by Defendants, Plaintiff Castillo noticed her hair falling out shortly after the first few uses. Prior to using the Products, Plaintiff Castillo had never experienced hair loss or scalp irritation.

124.    After using the Products as intended by Defendants, Plaintiff Castillo also experienced scalp irritation, including a burning sensation after using the Products, and her scalp became very red and dry. The redness, hotness, and itchiness of Plaintiff's scalp would persist for up to seven hours after using the Products.

125.    Furthermore, Plaintiff's hair became dry, brittle, and broke off easily after using the Products.

126.    Plaintiff Castillo used the Products for approximately two weeks. After she began experiencing hair loss and scalp irritation, she stopped using the Products and discarded them.

127.    Once Plaintiff stopped using the Products, she no longer experienced hair loss and scalp irritation.

128.    Plaintiff Castillo reasonably expected that the Products she purchased would not cause hair loss and/or scalp irritation. Further, Plaintiff Castillo reasonably expect that if Unilever, the company primarily responsible for developing, manufacturing, marketing and distributing the Products, knew that the Products would or could cause hair loss and/or scalp irritation, Unilever would make a disclosure to consumers as soon as it determined there was a widespread problem, rather than attempting to conceal the problem.

129.    As a result of Unilever's concealment, misrepresentations and omissions, Plaintiff Castillo purchased the Products. Had Plaintiff known the true nature of the Products, she would

31

not have purchased the Products.

130.   Plaintiff provided pre-suit notice to Defendants of her warranty claims, and Defendants had actual notice of the alleged defect and harm caused by the Products.

## ESTOPPEL FROM PLEADING AND
## TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

131.   Plaintiff and members of the Classes are within the applicable statute of limitation for the claims presented here. Defendants have knowledge and information detailing the Products' propensity to cause or contribute to hair loss and/or scalp irritation, but failed to disclose this information to consumers, and Plaintiff and members of the Classes therefore could not reasonably have known that the Products would cause or contribute to hair loss and scalp irritation. Rather, consumers relied upon Defendants' misrepresentations and omissions, including the statements on the Products' labeling as set forth above.

132.   Once Plaintiff incurred damages, she promptly acted to preserve her rights, filing this action. Defendants are estopped from asserting any statute of limitation defense that might otherwise be applicable to the claims asserted herein.

## CLASS ACTION ALLEGATIONS

133.   Plaintiff brings this action on behalf of herself and the following Classes pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and/or (b)(3). Specifically, the Classes are defined as:

>**National Class**: All persons in the United States who purchased the Products

>**Consumer Fraud Multi-State Class**: All persons in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington who purchased the Products.[48]

---

[48] The States in the Consumer Fraud Multi-State Class are limited to those States with similar consumer fraud laws under the facts of this case: California (Cal. Bus. & Prof. Code §17200, *et*

**Illinois Class**: All persons in the State of Illinois who purchased the Products.

134.     Excluded from the Classes are (a) any person who purchased the Products for  resale and not for personal or household use, (b) any person who signed a release of any Defendant in exchange for consideration, (c) any officers, directors or employees, or immediate family members of the officers, directors or employees, of any Defendant or any entity in which a Defendant has a controlling interest, (d) any legal counsel or employee of legal counsel for any Defendant, and (e) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members.

135.     Plaintiff reserves the right to amend the definition of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

136.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** Class Members are so numerous and geographically dispersed that joinder of all Class Members is impracticable. While the exact number of Class Members remains unknown at this time, upon information and belief, there are thousands, if not hundreds of thousands, of putative Class Members. Moreover, the number of members of the Classes may be ascertained from Defendants' books and records. Class Members may be notified of the pendency of this action by mail and/or electronic mail, which can be supplemented if deemed necessary or appropriate by the Court with published notice.

137.     **Predominance of Common Questions of Law and Fact – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all Class Members and predominate over any questions affecting only individual Class Members. These common legal and factual questions include, but are limited to, the following:

---

*seq*.); Florida (Fla. Stat. §501.201, *et seq*.); Illinois (815 Ill. Comp. Stat. 505/1, *et seq*.); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq*.); Michigan (Mich. Comp. Laws §445.901, *et seq*.); Minnesota (Minn. Stat. §325F.67, *et seq*.); Missouri (Mo. Rev. Stat. §407.010, *et seq*.); New Jersey (N.J. Stat. §56:8-1, *et seq*.); New York (N.Y. Gen. Bus. Law §349, *et seq*.); and Washington (Wash. Rev. Code §19.86.010, *et seq*.).

a.  Whether the Products contain the defect alleged herein;

b.  Whether Defendants failed to appropriately warn Class Members of the damage that could result from use of the Products;

c.  Whether Defendants had actual or imputed knowledge of the defect but did not disclose it to Plaintiff and the Classes;

d.  Whether Defendants promoted the Products with false and misleading statements of fact and material omissions;

e.  Whether Defendants' marketing, advertising, packaging, labeling, and/or other promotional materials for the Products are deceptive, unfair or misleading;

f.  Whether Defendants' actions violate the State consumer fraud statutes invoked below;

g.  Whether Defendants breached express warranties in connection with the Products;

h.  Whether Defendants breached implied warranties in connection with the Products;

i.  Whether Defendants' acts, omissions or misrepresentations of material facts constitute fraud;

j.  Whether Defendants' acts, omissions or misrepresentations of material facts constitute a breach of contract or common law warranty;

k.  Whether Plaintiff and putative members of the Classes have suffered an ascertainable loss of monies or property or other value as a result of Defendants' acts, omissions or misrepresentations of material facts;

l.  Whether Defendants were unjustly enriched at the expense of Plaintiff and members of the putative Classes in connection with the Products;

m. Whether Plaintiff and members of the putative Classes are entitled to monetary damages and, if so, the nature of such relief; and

n.  Whether Plaintiff and members of the putative Classes are entitled to equitable, declaratory or injunctive relief and, if so, the nature of such relief.

138.   Pursuant to Rule 23(b)(2), Defendants have acted or refused to act on grounds generally applicable to the putative Classes, thereby making final injunctive or corresponding declaratory relief appropriate with respect to the putative Classes as a whole. In particular,

Defendants have manufactured, marketed, advertised, distributed and sold Products that are deceptively misrepresented as being able to safely smooth, nourish, cleanse, and/or repair hair.

139. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of those of the absent Class Members in that Plaintiff and the Class Members each purchased and used the Products and each sustained damages arising from Defendants' wrongful conduct, as alleged more fully herein. Plaintiff shares the aforementioned facts and legal claims or questions with putative members of the Classes, and Plaintiff and all members of the putative Classes have been similarly affected by Defendants' common course of conduct alleged herein. Plaintiff and all members of the putative Classes sustained monetary and economic injuries including, but not limited to, ascertainable loss arising out of Defendants' deceptive misrepresentations regarding the ability of the Products to safely smooth, nourish, cleanse, and/or repair hair, as alleged herein.

140. **Adequacy – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff will fairly and adequately represent and protect the interests of the members of the putative Classes. Plaintiff has retained counsel with substantial experience in handling complex class action litigation, including complex questions that arise in this type of consumer protection litigation. Further, Plaintiff and her counsel are committed to the vigorous prosecution of this action. Plaintiff does not have any conflicts of interest or interests adverse to those of putative Classes.

141. **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a class action, Plaintiff and members of the Classes will continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated consumers,

substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendants. Accordingly, the proposed Classes satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

142.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure  23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiff and all Members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole.

143.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available methods for the fair and efficient adjudication of the present controversy for at least the following reasons:

    a.    The damages suffered by each individual members of the putative Classes do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct;

    b.    Even if individual members of the Classes had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed;

    c.    The claims presented in this case predominate over any questions of law or fact affecting individual members of the Classes;

    d.    Individual joinder of all members of the Classes is impracticable;

    e.    Absent a Class, Plaintiff and members of the putative Classes will continue to suffer harm as a result of Defendants' unlawful conduct; and

    f.    This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and members of the putative Classes can seek redress for the harm caused by Defendants.

144.    In the alternative, the Classes may be certified for the following reasons:

    a.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants;

b.  Adjudications of claims of the individual members of the Classes against Defendants would, as a practical matter, be dispositive of the interests of other members of the putative Classes who are not parties to the adjudication and may substantially impair or impede the ability of other putative Class Members to protect their interests; and

c.  Defendants have acted or refused to act on grounds generally applicable to the members of the putative Classes, thereby making appropriate final and injunctive relief with respect to the putative Classes as a whole.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation Of State Consumer Fraud Acts**
**(On Behalf Of The Multi-State Class)**

145.    Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 144, as though set forth fully herein.

146.    The Consumer Fraud Acts of the States in the Multi-State Class[49] prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

147.    Unilever intended that Plaintiff and each of the other members of the Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

148.    Had the truth been known, Plaintiff and other Multi-State Class Members would not have purchased Unilever's Products.

149.    As a result of Unilever's use or employment of unfair or deceptive acts or business practices, Plaintiff and each of the other members of the Multi-State Class have sustained damages in an amount to be proven at trial.

---

[49] California (Cal. Bus. & Prof. Code §17200, *et seq.*); Florida (Fla. Stat. §501.201, *et seq.*); Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws §445.901, *et seq.*); Minnesota (Minn. Stat. §325F.67, *et seq.*); Missouri (Mo. Rev. Stat. §407.010, *et seq.*); New Jersey (N.J. Stat. §56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §349, *et seq.*); and Washington (Wash. Rev. Code §19.86.010, *et seq.*).

150. In addition, Unilever's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## COUNT II
### Violation Of The Illinois Consumer Fraud Act
### (In The Alternative To Count I And On Behalf Of The Illinois Class)

151. Plaintiff repeats and realleges the allegations in paragraphs 1 through 144 as if fully set forth herein.

152. The Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/1, *et seq.*, prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce. The ICFA is to be liberally construed to effectuate its purpose.

153. Plaintiff and other members of the Illinois Class, as purchasers of the Products, are consumers within the meaning of the ICFA given that Unilever's business activities involve trade or commerce, are addressed to the market generally and otherwise implicate consumer protection concerns.

154. Unilever's conduct in misrepresenting the benefits of its Products constitute the act, use and employment of deception, fraud, false pretenses, false promises, misrepresentation, and unfair practices in the conduct of Unilever's trade or commerce.

155. Unilever also knowingly concealed, suppressed, and consciously omitted material facts to Plaintiff and other members of the Illinois Class knowing that consumers would rely on the advertisements and packaging and Unilever's uniform representations to purchase the Products.

156. Once the defect in the Products and its tendency to cause hair loss and/or scalp irritation despite proper application (or based upon foreseeable misapplication) became apparent to Unilever, consumers (Plaintiff and other members of the putative Illinois Class) were entitled to disclosure of that fact because a significant risk of hair loss and/or scalp irritation would be a material fact in a consumer's decision-making process, and, without Unilever's disclosure

consumers would not necessarily know that there is such a risk.

157.    Unilever intended that Plaintiff, and the Illinois Class would rely on the continued deception by purchasing the Products, unaware of the material facts and omissions described above. Unilever knew that its customers would continue to rely on its representations that the Products were safe when used as directed, and knew that consumers would continue to rely upon its silence as to any known risk of hair loss and/or scalp irritation as evidence that the Products were safe. This conduct constitutes consumer fraud within the meaning of the ICFA.

158.    Unilever's material non-disclosure set forth above constitutes an unconscionable commercial practice, deception, fraud, false promise, misrepresentation and/or omission of material facts as to the nature of the goods, in violation of the ICFA.

159.    Plaintiff and the other members of the Illinois Class suffered damages as a proximate result of the unfair acts or practices of Unilever alleged herein. Unilever's misrepresentations and/or omissions of material fact were done knowingly, intentionally, willfully or with reckless disregard for the consequences of its actions.

160.    Plaintiff and other members of the Illinois Class would not have purchased the Products but for the promised benefits and concealment of any risk of harm because the Products as sold had no intrinsic value to them

161.    Unilever knowingly accepted the benefits of its deception and improper conduct in the form of profits from the increased sale of the Products.

162.    As a proximate result of the above-described violations of the ICFA, Plaintiff and other members of the Class: (a) purchased and used the Products when they would not otherwise have done so; (b) suffered economic losses consisting of the cost of purchasing the Products; and (c) suffered and/or will suffer additional economic losses in repairing and restoring the damage caused by the Products.

163.    Unilever's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

164.    Plaintiff also seeks to enjoin Unilever's ongoing deceptive practices relating to their claims on the Products' labels and advertising.

**COUNT III**
**Breach Of Express Warranty**
**(On Behalf Of The National Class)**

165.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 144 as if fully set forth herein.

166.    Plaintiff, and each member of the National Class, formed a contract with Defendants at the time Plaintiff and the other members of the National Class purchased the Products. The terms of the contract included the promises and affirmations of fact made by Defendants on the Products' packaging and through marketing and advertising, as described above. This labeling, marketing and advertising constitute express warranties and became part of the basis of bargain, and are part of the standardized contract between Plaintiff and the members of the National Class and Defendants.

167.    Plaintiff and the National Class performed all conditions precedent to Defendants' liability under this contract when they purchased the Products.

168.    Defendants breached express warranties about the Products and their qualities because Defendants' statements about the product were false and the product does not conform to Defendants' affirmations and promises as described above.

169.    Had they known the true nature of the Products, Plaintiff and each of the members of the National Class would not have purchased the Products.

170.    As a result of Defendants' breach of warranty, Plaintiff and each of the members of the National Class have been damaged in the amount of the purchase price of the Products and any

40

consequential damages resulting from their purchases.

171.     On October 30, 2020, Plaintiff Castillo mailed a notice letter to Defendants Unilever and Conopco. The letter was sent on behalf of Plaintiff and all other persons similarly situated. Defendants responded and denied the allegations contained herein.

172.     Furthermore, Defendants had actual knowledge of the defect in the Products purchased by Plaintiff, as well as the Products purchased by other members of the National Class, because: (a) it has knowledge of various studies concluding the inefficacy of the ingredients included in the formulation of the Products; (b) it has knowledge of the complaints made by consumers who purchased the Products; and (c) it had knowledge since *at least* 2012 based on the lawsuit styled *Reid, et al. v. Unilever United States, Inc., et al.*, 1:12-cv-06058 (N.D.Ill.).

## COUNT IV
### Breach of Contract/Common Law Warranty
### (On Behalf of the Illinois Class)

173.     Plaintiff Castillo repeats and realleges the allegations in paragraphs 1 through 144 as if fully set forth herein.

174.     Plaintiff Castillo brings this cause of action on behalf of herself and the Illinois Class against Defendants.

175.     To the extent Defendants' commitment is deemed not to be a warranty under Illinois's Uniform Commercial Code, Plaintiff Castillo pleads in the alternative under common law warranty and contract law.

176.     Plaintiff Castillo and Illinois Class Members purchased the Products either directly from Defendants or through retailers such as Walmart, CVS, Target, and Walgreens, among others.

177.     Defendants purport through their advertising and packaging to create express warranties and/or contract that the Products were hair "Smoothing" Products and that the Products were safe to smooth, nourish, cleanse or repair hair.

41

178. Defendants made the foregoing express representations and warranties and/or contract to all consumers, which became the basis of the bargain between Plaintiff Castillo, Illinois Class Members and Defendants.

179. All conditions precedent to Defendants' liability under this warranty and/or contract were performed by Plaintiff and the Illinois Class when they purchased the Products and used the Products as directed.

180. Defendants breached the warranties and/or contract about the Products and their qualities because Defendants' statements about the Products were false and the Products do not conform to Defendants' affirmations and promises described above. Plaintiff and the Illinois Class Members would not have purchased the Products had they known the true nature of the Products and the misstatements regarding what the Products were. This substantially and/or completely impairs the use and value of the Products, which were not discoverable by Plaintiff Castillo and Illinois Class Members at the time of their purchase of the Products.

181. As a direct and proximate cause of Defendants' breach of warranty and/or contract, Plaintiff Castillo and the Illinois Class Members were harmed because they would not have purchased the Products if they had known the truth about the Products.

182. As a result of Defendants' breach of warranty and/or contract, Plaintiff and the Illinois Class have been damaged in the amount of the purchase price of the Products and any consequential damages resulting from the purchases, including the cost to repair their hair loss.

183. On October 30, 2020, Plaintiff Castillo mailed a notice letter to Defendants Unilever and Conopco. The letter was sent on behalf of Plaintiff and all other persons similarly situated. Defendants responded and denied the allegations contained herein.

184. Furthermore, Defendants had actual knowledge of the defect in the Products purchased by Plaintiff, as well as the Products purchased by other members of the National Class,

because: (a) it has knowledge of various studies concluding the inefficacy of the ingredients included in the formulation of the Products; (b) it has knowledge of the complaints made by consumers who purchased the Products; and (c) it had knowledge since at least 2012 based on the lawsuit styled *Reid, et al. v. Unilever United States, Inc., et al.*, 1:12-cv-06058 (N.D.Ill.).

### COUNT V
**Breach of Implied Warranty**
**(On Behalf of the Nationwide Class and/or Illinois Class)**

185.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 144 as if fully set forth herein.

186.    Plaintiff brings this claim individually and on behalf of the Nationwide Class and/or Illinois Class.

187.    At all times relevant hereto, there was a duty imposed by law which requires that a manufacturer or seller's product be reasonably fit for the purposes for which such products are used, and that products be acceptable in trade for the products' description.

188.    Notwithstanding the aforementioned duty, at the time of delivery, the Products sold to Plaintiff was not merchantable because they contained a defect that caused hair loss and/or scalp irritation upon proper application and did not otherwise perform as represented.

189.    Defendants were notified that the Products were not merchantable within a reasonable time after the defect manifested to Plaintiff and the Class.

190.    As a result of the non-merchantability of the Products, Plaintiff and the Class sustained damages.

191.    On October 30, 2020, Plaintiff Castillo mailed a notice letter to Defendants Unilever and Conopco. The letter was sent on behalf of Plaintiff and all other persons similarly situated. Defendants responded and denied the allegations contained herein.

192.    Furthermore, Defendants had actual knowledge of the defect in the Products

purchased by Plaintiff, as well as the Products purchased by other members of the National Class, because: (a) it has knowledge of various studies concluding the inefficacy of the ingredients included in the formulation of the Products; (b) it has knowledge of the complaints made by consumers who purchased the Products; and (c) it had knowledge since at least 2012 based on the lawsuit styled *Reid, et al. v. Unilever United States, Inc., et al.*, 1:12-cv-06058 (N.D.Ill.).

**COUNT VI**
**Fraud**
**(On Behalf of the Nationwide and/or Multi-State Class**
**and/or Illinois Class)**

193.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 144 as if fully set forth herein.

194.    Plaintiff brings this cause of action on behalf of herself, the Nationwide Class and/or Multi-State Class and/or the Illinois Class against Defendants.

195.    As alleged herein, Defendants knowingly made material misrepresentations and omissions regarding the Products on the Products' labeling and packaging in the Products' advertisements, and/or on their website.

196.    Defendants made these material misrepresentations and omissions in order to induce Plaintiff and putative Class Members to purchase the Products.

197.    Rather than inform consumers that the Products contained a defect that caused hair loss upon proper application and did not otherwise perform as represented and for the particular purpose for which it was intended, Defendants claim in marketing materials and their marketing campaign for the Products that the Products would "smooth," "deeply nourish," "gently cleanse," and "repair hair,"[50]  in order to mislead consumers that the Products have the ability to safely smooth, nourish, cleanse, and/or repair hair.

---

[50] https://www.tresemme.com/us/en/collections/keratin-smooth.html ("How it Works")

198.     The inclusion of the defect that causes hair loss and/or scalp irritation upon proper application renders the Products unable to safely smooth, nourish, cleanse, and repair hair.

199.     Defendants knew the Products were incapable of safely smoothing, nourishing, cleansing, and/or repairing hair, but nevertheless made such representations through the marketing, advertising and on the Products' labeling. In reliance on these and other similar misrepresentations, Plaintiff and putative Class Members were induced to, and did, pay monies to purchase the Products.

200.     Had Plaintiff and the Class known the truth about the Products, they would not have purchased the Products.

201.     As a proximate result of the fraudulent conduct of Defendants, Plaintiff and the putative Class paid monies to Defendants, through their regular retail sales channels, to which Defendants are not entitled, and have been damaged in an amount to be proven at trial.

<u>**COUNT VII**</u>
**Unjust Enrichment**
**(On Behalf of the Nationwide Class and/or Multi-State Class**
**and/or Illinois Subclass)**

202.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 144 as if fully set forth herein.

203.     Plaintiff brings this cause of action on behalf of herself, and the putative Classes against Defendants.

204.     Plaintiff and putative Class Members conferred a benefit on Defendants when they purchased the Products, of which Defendants had knowledge. By their wrongful acts and omissions described herein, including selling the Products, which contain a defect that caused hair loss upon proper application and did not otherwise perform as represented and for the particular purpose for which they were intended, Defendants were unjustly enriched at the expense of Plaintiff and

45

putative Class Members.

205.    Plaintiff's detriment and Defendants' enrichment were related to and flowed from the wrongful conduct challenged in this Complaint.

206.    Defendants have profited from their unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiff and putative Class Members under circumstances in which it would be unjust for Defendants to be permitted to retain the benefit. It would be inequitable for Defendants to retain the profits, benefits, and other compensation obtained from their wrongful conduct as described herein in connection with selling the Products.

207.    Defendants have been unjustly enriched in retaining the revenues derived from Class Members' purchases of the Products, which retention of such revenues under these circumstances is unjust and inequitable because Defendants manufactured defective Products, and Unilever misrepresented the nature of the Products, misrepresented their ingredients, and knowingly marketed and promoted dangerous and defective Products, which caused injuries to Plaintiff and the Class because they would not have purchased the Products based on the same representations if the true facts concerning the Products had been known.

208.    Plaintiff and putative Class Members have been damaged as a direct and proximate result of Defendants' unjust enrichment because they would not have purchased the Products on the same terms or for the same price had they known the true nature of the Products and the mis-statements regarding what the Products were and what they contained.

209.    Defendants either knew or should have known that payments rendered by Plaintiff and putative Class Members were given and received with the expectation that the Products were able to safely nourish, cleanse, and repair hair as represented by Defendants in advertising, on Defendants' websites, and on the Products' labels and packaging. It is inequitable for Defendants to retain the benefit of payments under these circumstances.

210.    Plaintiff and putative Class Members are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants.

211.    When required, Plaintiff and Class Members are in privity with Defendants because Defendants' sale of the Products was either direct or through authorized sellers. Purchase through authorized sellers is sufficient to create such privity because such authorized sellers are Defendants' agents for the purpose of the sale of the Products.

212.    As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment, Plaintiff and putative Class Members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendants for their inequitable and unlawful conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated members of the Classes, pray for relief and judgment, including entry of an order:

A. Declaring that this action is properly maintained as a class action, certifying the proposed Class(es), appointing Plaintiff as Class Representative and appointing Plaintiff's counsel as Class Counsel;

B. Directing that Defendants bear the costs of any notice sent to the Class(es);

C. Declaring that Defendants must disgorge, for the benefit of the Class(es), all or part of the ill-gotten profits they received from the sale of the Products, or order Defendants to make full restitution to Plaintiff and the members of the Class(es);

D. Awarding restitution and other appropriate equitable relief;

E. Granting an injunction against Unilever to enjoin it from conducting its business through the unlawful, unfair and fraudulent acts or practices set forth herein;

F. Granting an Order requiring Unilever to fully and appropriately recall the Products, to remove the claims on its website and elsewhere that the Products are safe to use, and to fully and properly disclose the safety risks associated with the Products to anyone who may still be at risk of buying and using the Products;

G. Awarding Plaintiff and members of the Class(es) statutory damages, as provided by the

applicable state consumer protection statutes invoked above;

H. Enjoining Defendants from continuing to engage in the unlawful and unfair business acts and practices as alleged herein;

I. Awarding attorneys' fees and litigation costs to Plaintiff and members of the Class(es);

J. Awarding civil penalties, prejudgment interest and punitive damages as permitted by law;

K. Ordering a jury trial and damages according to proof; and

L. Ordering such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Dated: November 16, 2020

Respectfully submitted,

*/s/ Jonathan Shub*
Jonathan Shub
Kevin Laukaitis
**SHUB LAW FIRM LLC**
134 Kings Highway E, 2nd Floor
Haddonfield, NJ 08033
T: 856-772-7200
F: 856-210-9088
jshub@shublawyers.com
klaukaitis@shublawyers.com

Andrew J. Sciolla*
**SCIOLLA LAW FIRM LLC**
Land Title Building
100 S. Broad Street, Suite 1910
Philadelphia, PA 19110
T: 267-328-5245
F: 215-972-1545
andrew@sciollalawfirm.com

Daniel K. Bryson*
Harper T. Segui*
Caroline Ramsey Taylor*
**WHITFIELD BRYSON, LLP**
900 W. Morgan Street
Raleigh, NC 27603
T: 919-600-5000
dan@whitfieldbryson.com

48

harper@whitfieldbryson.com
caroline@whitfieldbryson.com

*Pro Hac Vice* Application Forthcoming

*Attorneys for Plaintiff and Putative Class Members*